## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Bianca Ragone, a Special Agent with Homeland Security Investigations, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint related to violations of Title 8 United States § 1324(a)(1)(A)(ii) & (B)(i), Transportation or Moving of an Alien for the purpose of commercial advantage or private financial gain. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I did not include each and every fact known concerning this investigation. I did not withhold any information or evidence that would negate probable cause. The statements contained in this affidavit are based in part on information and analysis provided by law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of subpoenas and execution of search warrants; interview(s); and my experience, training and background as a Special Agent. I set forth only the facts that are believed to be necessary to establish probable cause that Juan Jacobo ORTEGA GUEVARA committed the violations listed above.

2. I am a Special Agent of Homeland Security Investigations (HSI), also known as Immigration and Customs Enforcement (ICE), assigned to the Office of the Assistant Special Agent in Charge, Columbus, Ohio, since September 2019. During my tenure as a Special Agent, I have completed the Criminal Investigator Training Program and the HSI Special Agent Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I received training that included drug and human smuggling, immigration, and other violations of federal law. I am currently based out of the Guernsey County Sheriff's Office (GCSO), and I am responsible for enforcing federal law in the Southern District of Ohio. Moreover, I am a federal law enforcement officer who is responsible for enforcing federal criminal laws, including violations of 8 U.S.C § 1326 and 8 U.S.C. § 1324, and I am authorized by law to request a criminal complaint.

## FACTS SUPPORTING PROBABLE CAUSE

3. On April 2, 2025, the Ohio State Highway Patrol (OSHP) received a Be On The Lookout ("BOLO") alert from United States Border Patrol (BP) for a White Ford Explorer bearing Arizona license plate E8A44X (the "Vehicle"), which was possibly smuggling humans and/or narcotics through Ohio. At approximately 9:44 a.m., OSHP located the Vehicle, witnessed it committing a lane violation, and conducted a traffic stop on I-70 east near mile marker 178 in Cambridge, Ohio.

4. I was called to the above-mentioned traffic stop, where I met with OSHP Trooper (Trp.) Seth Jones. Trp. Jones stated the driver, who initially identified himself as "Ezequeil Neir" but was later identified as Zenaido Neri Perez, claimed he was "in charge." Neri Perez did not speak English and presented Mexican identification utilizing the "Neir" alias. The front seat passenger, Juan Jacobo ORTEGA GUEVARA, presented a California driver's license, spoke some English, and had a large bundle of U.S. Currency on his person totaling approximately $3,000.

5. OSHP Trp. Tysinger deployed his narcotics canine around the above-mentioned vehicle simultaneous to Trp. Jones conducting his normal traffic stop duties. A positive indication was given by the canine to the presence of the odor of narcotics. A probable cause search of the vehicle was conducted by OSHP. No narcotics were located in the vehicle, though items consistent with trafficking were found, such as Santa Muerte figures and multiple cellphones. Santa Muerte, which is frequently depicted as a grim reaper, is often utilized by traffickers to symbolize safe passage and protection. It is also common for traffickers of both people and drugs to have more than one cellphone.

6. The other occupants of the Vehicle were identified as Merlin Ismael Garcia Soto, Ana Carmen Flores Garcia, Jose Choc Yat, Jose Luis Roman Avilez, and Carlos Garcia Carrillo.

7. I contacted the ICE Law Enforcement Support Center, which provides real-time assistance to law enforcement on matters including undocumented aliens (UDAs)

suspected of criminal activity and obtained the following information. ORTEGA GUEVARA had illegally entered the United States from Mexico twice in 2006 and was allowed a voluntary return both times. He did not have an alien number, and he had been charged with felony domestic violence, though the charge was dismissed.

8. I spoke to BP Agents Tyler Adkins and Brian Bitter regarding their ongoing investigation into a criminal organization with which the Vehicle was connected, as the BOLO had noted. I was advised of the following information.

    a. They had conducted 20-30 search warrants in the last few months resulting in six figures of bulk cash seized, 150 pounds of methamphetamines seized, 2 pounds of cocaine seized, 50 kilograms of fentanyl seized. Their investigation had secured over 70 criminal convictions and led to many deportations, and it had uncovered millions of dollars being moved from the United States to Mexico related to human smuggling and drug trafficking crimes.

    b. Additionally, ORTEGA GUEVARA was a known "caretaker" of a stash house[1] in Phoenix, Arizona. The stash house was for both humans and narcotics.

    c. The Vehicle had been seen at four related stash houses and had recently completed a cross-country round trip ending in Phoenix, Arizona.

    d. Based upon previous interviews and information obtained from cellphone extractions, it was known to BP that new UDAs were picked up in the Vehicle and were enroute to their drop off location(s) when it was pulled over in Ohio. License plate reader results on the Vehicle showed constant cross-country trips consistent with human smuggling/transportation of UDAs.

    e. For border crossings, this specific smuggling organization usually would guide UDAs through the desert via phone calls and text messages. Once the UDA was on the United States side their phone would be taken (sometimes destroyed). The

---

[1] A stash house is a building, trailer, or house where weapons, drugs, illegal aliens, or illegal items are hidden or stored. These so-called stash houses are used by alien smuggling syndicates as well as other organized criminal groups.

person meeting the UDA from the organization wore a ski mask and would usually take the UDA to a nearby apartment that was operated as a stash house. Common pick-up spots by the drivers of the organization were Walmart and Home Depot parking lots.

9. All seven occupants of the Vehicle were asked basic alienage questions. Specifically, each was asked place of birth, place of parents' birth, date and manner of crossing into the United States, and if he/she had any papers to pass through or remain in the United States. None of the occupants had lawful status to pass through or remain in the United States. All seven occupants were taken into custody for further processing at the HSI/ICE office located in Westerville, Ohio.

## INTERVIEWS

10. On April 2, 2025, HSI Special Agent (SA) Paul Mills and I interviewed ORTEGA GUEVARA with a Spanish interpreter via telephone. ORTEGA GUEVARA was read his *Miranda* rights, waived them in writing, agreed to speak with investigators, and stated the following.

    a. The Vehicle belonged to a friend named Alejandro. ORTEGA GUEVARA had worked for a criminal organization for approximately 3-4 months transporting illegal aliens around the United States. Friends of his who worked for the organization initially connected him to it; most of those friends had recently been deported.

    b. To initiate a cross-country trip transporting UDAs, a Mexican number would call and/or text him an address to meet the UDAs.

    c. On this particular trip, he picked up all UDAs on or about March 31, 2025, in a Walmart parking lot in Phoenix, Arizona. Family members of each UDA paid him approximately $150-200 for the trip. His gas and expenses were paid by the organization, and the $150-200 per person was his cut to keep. He knew all individuals in the vehicle stopped in Ohio were illegally present in the United States. He initially started driving but then got tired and switched with Neri Perez.

      He stated that he and Neri Perez were just friends, and that Neri Perez did not work for the criminal organization. He was supposed to drop everyone off in Pennsylvania. They made one stop along the way for gas and he paid.

    d. He had completed three trips while working for this organization and made approximately $3,000 in total.

11. On April 2, 2025, HSI SA Paul Mills and I interviewed Neri Perez with a Spanish interpreter via telephone. Neri Perez was read his *Miranda* rights, waived them in writing, agreed to speak with investigators, and stated the following.

    a. He illegally crossed into the United States 8-9 months prior on foot near El Paso, TX. He paid approximately $8,000 and crossed by himself. He stated his "coyote".[2] left him alone, so he finished the journey by himself. Once he reached the border, he called a family member to come pick him up.

    b. He stated he was heading to Pennsylvania with friends to look for work. Neri Perez denied driving illegal aliens as work and stated he was "just helping a friend." He identified ORTEGA GUEVARA as that "friend." He stated ORTEGA-GUEVARA was just tired, so he drove for him.

    c. Neri Perez denied knowing that ORTEGA-GUEVARA was working for a criminal organization. He stated they met in the United States, and they were going to look for work together. He initially stated that everyone in the Vehicle was coming from California. Then he stated that ORTEGA-GUEVARA picked him up at his residence in Albuquerque, NM and everyone was already in the Vehicle when it arrived.

    d. He stated that he told OSHP that he was "in charge" during the traffic stop because he was the one driving, so it was assumed that he had control.

---

[2] Slang term for a human smuggler, particularly in the context of illegal immigration across the Mexico-United States border. They guide and facilitate the illegal crossing of migrants into the U.S., often for a fee.

12. On April 2, 2025, HSI SA Paul Mills and I interviewed Garcia Carrillo in English. Garcia Carrillo was read his *Miranda* rights, waived them in writing, agreed to speak with investigators, and stated the following.

    a. He crossed illegally into the United States in approximately January of 2025. He paid approximately $2,000 and crossed with one or two other people. He was provided instructions on the specifics of crossing the border via telephone instructions. He was arrested by immigration and deported to Mexico. He crossed illegally into the United States in approximately February of 2025. He stated he did not pay anything for that crossing since he was arrested and deported in January.

    b. Once he reached the United States side someone unknown to him picked him up. His cellphone was taken from him, and he was then taken to a house for a few hours. He was picked up from that house and brought to a mall area. The Vehicle was there to pick all passengers up and was driven by ORTEGA GUEVARA.

    c. ORTEGA GUEVARA initially started the drive but then he switched with Neri Perez. ORTEGA GUEVARA and Neri Perez appeared to be friends and know one another. He stated he was heading to New York. No one was picked up or dropped off during their journey, but some people in the vehicle were heading to Pennsylvania. The only stops they made on their journey were for gas.

13. On April 2, 2025, HSI SA Paul Mills and I interviewed Choc Yat with a Spanish interpreter via telephone. Choc Yat was read his *Miranda* rights, waived them in writing, agreed to speak with investigators, and stated the following.

    a. He illegally crossed into the United States approximately three weeks prior and paid $6,000. He was provided a pin number to deposit the $6,000 into an account. The coordination to cross the border was done over the phone via text messages and phone calls. He crossed by himself, and it took him approximately two days and one night.

    b. Once he arrived on the U.S. side, he was met with an individual wearing a ski mask and his phone was taken and destroyed. He described the vehicle that picked him up as a smaller "grey/shiny" four-person vehicle. He was then taken to an apartment, but was unsure of the location, and he was dropped off. There were three other people at the apartment when he arrived. He estimated he was at the apartment for 4-5 days before the drive started.

    c. He stated he did not know anyone in the Vehicle, and he was heading to Pennsylvania to look for work. He exchanged 1,700 pesos for a ride. The person who "took him out of the apartment said to catch a ride with the group." The $6,000 he paid was just to get him to the U.S. side and did not include the cost of the ride to Pennsylvania.

    d. He stated they made two stops for gas and the "chubby dark skin man" pumped the gas both times; he identified ORTEGA GUEVARA from a photograph as this person. He was not told to say anything specific if/when they were stopped by law enforcement. No one was picked up or dropped off during their trip.

14. On April 7, 2025, I interviewed Flores Garcia with a Spanish interpreter via telephone. Flores Garcia was read her *Miranda* rights, waived them in writing, agreed to speak with me, and stated the following.

    a. She had been in the United States approximately two months. She had illegally crossed into the United States on foot somewhere near Sonora, Mexico (Nogales, AZ). She paid $10,000 to be smuggled into the United States and receive transportation to her final destination within the United States, which was Pennsylvania. Two other people crossed the desert into the United States with her, one of whom was a guide. The guide wore a mask during the entire journey.

    b. Once she got to the United States side, her cellphone was taken from her and she was then taken to an apartment somewhere in Phoenix, Arizona in a small red vehicle. After about a week, she was then taken to another apartment by that same red vehicle.

    c. In the parking lot of the new apartment, she saw the Vehicle, and ORTEGA GUEVARA was loading his luggage into it. All other occupants besides Neri Perez were already in the Vehicle when she arrived. Neri Perez was picked up a few blocks from that apartment before the journey began.

    d. ORTEGA GUEVARA told everyone if they were stopped by law enforcement to say they all knew each other from work and that if they told that lie then they could continue with their journey.

    e. ORTEGA GUEVARA initially started driving, but after about a day or so of driving he switched with Neri Perez. Whenever they made a stop for gas, ORTEGA GUEVARA paid and pumped. They made one stop somewhere in Chicago, Illinois to drop off a female who started the journey with them.

    f. ORTEGA GUEVARA knew that Flores Garcia was illegally present in the United States.

15. On April 7, 2025, I interviewed Garcia Soto with a Spanish interpreter via telephone. Garcia Soto was read his *Miranda* rights, waived them in writing, agreed to speak with me, and stated the following.

    a. He illegally crossed into the United States approximately 1 month prior on foot somewhere near Texas by himself. He paid approximately $3,000 and was guided via cellphone on how/where to cross.

    b. After he crossed to the United States side an unknown person wearing a ski mask met him and took his cellphone. This unknown person then took him to a friend's house. He described the vehicle as a "normal small" vehicle but did not remember the color.

    c. A friend of his told him about people that could get him a ride to Pennsylvania to look for work. He did not pay any money for the ride. He was taken to an area that had a lot of stores and vehicles around, and the Vehicle picked him up there.

    d. He did not know anyone in the Vehicle besides ORTEGA GUEVARA, who he met during the trip. ORTEGA GUEVARA and another person unknown to him drove. They made two stops for gas, but he was not sure who paid or pumped because he was sleeping.

    e. He was unsure if ORTEGA GUEVARA knew if he was illegally present in the United States.

16. On April 7, 2025, I interviewed Roman Avilez with a Spanish interpreter via telephone. Roman Avilez was read his *Miranda* rights, waived them in writing, agreed to speak with me, and stated the following.

    a. He initially came into the United States in 2019 legally on a work visa. He was living in California with his wife's family. He was not doing well there and wanted to move to Pennsylvania.

    b. On or about March 29, 2025, Roman Avilez was picked up near his house in California by ORTEGA GUEVARA. ORTEGA GUEVARA was by himself at the time of the pickup. Roman Avilez identified ORTEGA GUEVARA from a photograph but did not know his name.

    c. Someone Roman Avilez knew contacted ORTEGA GUEVARA on his behalf to secure a ride to Pennsylvania. Roman Avilez did not pay for the ride.

    d. Everyone else in the Vehicle was picked up at the same spot somewhere near a highway, but Roman Avilez did not know any specifics. No one else was picked up or dropped off, and the only stops made were for food and gas. Every time they stopped for gas, ORTEGA GUEVARA paid, but each passenger paid for his/her own food.

    e. At some point during their journey, ORTEGA GUEVARA and Neri Perez switched driving. Roman Avilez met ORTEGA GUEVARA for the first time when he was picked up. He denied making any stops in Chicago, IL.

  f. ORTEGA GUEVARA did not give him instructions on what to say if law enforcement stopped them. He did not know the destination of others in the Vehicle.

## CRIMINAL & IMMIGRATION HISTORY

17. A search of immigration databases and a criminal history search revealed the following information related to ORTEGA GUEVARA.

  a. On or about April 20, 2006, BP apprehended ORTEGA GUEVARA near Tucson, AZ. He was allowed to voluntarily return to Mexico on foot.

  b. On or about April 22, 2006, BP apprehended ORTEGA GUEVARA near Tucson, AZ. He was allowed to voluntarily return to Mexico on foot.

  c. On or about March 5, 2023, ORTEGA GUEVARA was arrested in California by Venture County Sheriff's Office and Oxnard Police Department for misdemeanor False Imprisonment (236 PC) and felony Domestic Violence (273.5(A) PC). On or about March 7, 2023, the charges were dismissed due to lack of sufficient evidence.

## CONCLUSION

18. Based on these facts, there is probable cause to believe that ORTEGA GUEVARA did knowingly and in reckless disregard of the fact that certain aliens had come to, entered, and remained in the United States in violation of law, transport and move, attempt to transport and move, and conspire to transport and move, such aliens within the United States, by means of transportation and otherwise, for the purpose of commercial advantage or private personal gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) & (B)(i).

Respectfully submitted,

*Bianca Ragone*

                                                                                            Bianca Ragone  
                                                                                                    Special Agent  
                                                          Homeland Security Investigations

Sworn and subscribed to before me this 17th day of April 2025.


_____  
Chelsey Vascura  
United States Magistrate Judge  
U.S. District Court for the Southern District of Ohio